956 So.2d 1226 (2007)
Armando RODRIGUEZ, Appellant,
v.
STATE of Florida, Appellee.
No. 4D05-3782.
District Court of Appeal of Florida, Fourth District.
May 23, 2007.
*1227 Jeanne Baker of Jeanne Baker Attorney-at-Law, P.A., Miami, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Georgina Jimenez-Orosa, Assistant Attorney General, West Palm Beach, for appellee.
SHAHOOD, J.
Appellant, Armando Rodriguez, was charged by the Office of the Statewide Prosecutor by amended information with one count of organized scheme to defraud, thirty-two counts of grand theft cargo, and seventeen counts of offense against computer user. After being found guilty of all counts following a jury trial, the trial court dismissed the cargo theft counts on the ground that conviction of those counts together with conviction for organized scheme to defraud would constitute double jeopardy.
*1228 Appellant now appeals the count of organized scheme to defraud and the seventeen counts of offense against computer user. Appellant also appeals the restitution order entered by the trial court. We affirm in part, reverse in part, and remand for an evidentiary hearing on the issue of restitution.
Appellant was the warehouse manager for Tropicana Products, Inc.'s Chilled Direct Delivery Center in Miramar. He was responsible for the operations of the warehouse and his duties included ordering products and buying equipment. Appellant also put orders together and ensured that the product got loaded onto Tropicana's distribution trucks or the trucks of independent distributors correctly and on a timely basis. Part of appellant's responsibility was to make sure the inventory was accurate and there was not any loss. Appellant had an assistant warehouse manager and four other people working under him.
Tropicana's computerized inventory system was known as the Distribution Control System ("DCS"). Appellant was trained on this system in November 1999. Linda Gaunt, a training manager for Tropicana, showed appellant how to order and receive inventory consistent with his job responsibilities.
The DCS system had a function whereby a user could adjust the inventory in the computer to match the actual physical inventory in the warehouse. The codes for these upward or downward adjustments were 924 and 925. These adjustments were generally used to account for small variations that tended to eventually balance each other out. Only administrative staff were authorized to make 924 and 925 adjustments. Carmen Saavedra, the office manager, was the only one who had the training and authority to make 924 and 925 adjustments in summer 2003.
Gaunt therefore did not show appellant how to make 924 and 925 inventory adjustments at the time of his training. Gaunt gave appellant a manual which did not contain information on how to do 924 or 925 adjustments. Gaunt had specifically removed this information.
J.C. Alvarez owned Alcon Distributors ("Alcon"), one of the independent distributors doing business with Tropicana. Appellant and Alvarez were friends. Appellant approached Alvarez in summer 2001 and asked if he wanted to buy cases of product at a discount. They began with small orders. Alvarez would place an order. The legitimate part of the order from Tropicana would be marked for "Alvarez." This order would be placed with appellant or one of the other employees authorized to take product orders. The orders placed pursuant to Alvarez's separate arrangement with appellant were only ordered through appellant and would be marked "J.C." Both orders would be given to Alvarez at the time of pickup. Alvarez paid Tropicana for the orders placed with Tropicana. However, Alvarez would pay half of Tropicana's regular price for the "J.C." orders directly in cash to appellant. Appellant told Alvarez that their arrangement was made possible through an adjustment to the inventory on the computer.
Appellant and his assistant would take a physical count of the warehouse inventory at the end of every week. The inventory checks prior to Tropicana's move to a new facility in June 2003 were correct for the most part and any variances were small enough that they did not cause a shortage issue for the company.
Tropicana moved its warehouse to a new facility in June 2003. Appellant and the sales center manager, Franc Chaviano, took a physical inventory just prior to the move. After they finished moving, appellant *1229 had to take a sudden emergency leave for personal reasons, and was therefore unable to take another inventory. Chaviano and appellant's assistant took a physical inventory. This inventory revealed huge variances when checked against the office manager's computerized inventory. Chaviano and appellant's assistant conducted a second and a third inventory in an attempt to ascertain why the count could be incorrect. In the process of investigating how such a large variation could exist between the physical count and computer inventory, it was discovered that adjustments had been made to the computer inventory in very large amounts using appellant's user ID code.
Daryl Rashkin, Tropicana's senior manager for security, was informed of the situation and became involved in the investigation to determine who was responsible and the magnitude of the loss. Rashkin installed two surveillance cameras looking down on two of the loading bays. He installed a third camera in the ceiling tile of appellant's office over the computer. The cameras were connected to a digital recording device maintained in Chaviano's office. All of the recordings were date and time stamped by the DVD recorder.
Each day after the employees went home, Rashkin reviewed the recordings for the day to examine what activities were occurring at the two loading dock bays under surveillance. Rashkin and Chaviano would compare the day's order forms and the DCS transaction report against what the video showed was actually being loaded onto the particular trucks.
Rashkin came to the conclusion that Alcon and another independent distribution company called Kari & Sons were the two distributors involved. Appellant's father-in-law owned Kari & Sons. Appellant frequently took the orders for both Alcon and Kari & Sons. There was a substantial discrepancy between what these companies ordered for the day and what was actually being loaded onto their trucks. Almost without exception, the DCS transaction reports showed that the amount of 925 downward adjustments removing product from the inventory on the DCS system matched very closely to what the video showed being loaded onto the trucks. The DCS adjustment reports for the day fit very closely with the video surveillance of appellant at his computer.
The video surveillance covered the time period from July 14, 2003, to August 11, 2003. The videos showed either no order, with a large amount of product going into the trucks, or a small order with a larger amount of product going onto the trucks. In each instance, appellant was in the bay loading the trucks, and then on the computer making transaction adjustments. These orders were almost always for Alcon and Kari & Sons. The retail value of the product stolen during this time period was approximately $280,000. The wholesale value was approximately $140,000.
Appellant initially argues that his conviction for organized scheme to defraud was based on insufficient evidence because there was no evidence he made a communication inducing the handing over of property. Appellant was charged with a violation of section 817.034(4)(a)1., Florida Statutes (2003), which makes it a first-degree felony to obtain property by means of a scheme to defraud if the aggregate value of the property obtained is $50,000 or more. Appellant argues that this statute was intended to punish those who communicate fraudulent information to cause or induce the payment of money for worthless purposes.
The notion that section 817.034(4)(a) requires a defendant to have made a communication has previously been raised and *1230 rejected. In State v. Summerlot, 711 So.2d 589, 592 (Fla. 3d DCA 1998), the court held that "the state is not required to prove that a defendant `communicated' as a part of a scheme to defraud charged pursuant to section 817.034(4)(a)." See also Pizzo v. State, 910 So.2d 287, 290 (Fla. 2d DCA 2005).
We hold that communication is not required to sustain a conviction under section 817.034(4)(a), Florida Statutes, and affirm appellant's conviction for organized scheme to defraud.
Appellant next argues that the trial court erred in denying his motion for judgment of acquittal as to the offense against computer user counts because the evidence did not prove unauthorized access. Appellant argues that the evidence showed that he had access to the system, and the State's argument that he was not authorized to make 924 and 925 adjustments is a conceptually and legally distinct argument that he was not authorized to alter data. The State claims that authorized access includes authorized access to make use of any resources of a computer. The State maintains that the evidence showed appellant had authority to enter the DCS system, but no authority to access DCS to perform 924 or 925 adjustments. The State claims this falls under the making use of a "resource" of the Tropicana DCS system.
The information alleged that appellant "did willfully, knowingly and without authorization access or cause to be accessed a computer, computer system or computer network, to wit: the computer system located at the Tropicana Products, Inc., Miramar Sales Center. . . ." Section 815.06(1)(a) and (2)(b)2., Florida Statutes (2003), provides that anyone who "willfully, knowingly, and without authorization . . . [a]ccesses or causes to be accessed any computer, computer system, or computer network . . . for the purpose of devising or executing any scheme or artifice to defraud or obtain property" commits the offense. The definitions section supplies the meaning of the word "access" as used in the chapter: "`Access' means to approach, instruct, communicate with, store data in, retrieve data from, or otherwise make use of any resources of a computer, computer system, or computer network." § 815.03, Fla. Stat. (2003).
The evidence showed that appellant made the adjustments at a computer he was authorized to use, that he was authorized to access the system by using his password, and that he was authorized to access the network. However, it is also clear that appellant was not authorized to access the computer function he accessed in order to make inventory adjustments. Mr. Chaviano, Ms. Saavedra, and Ms. Gaunt all testified that appellant did not have the authority or training to make 924 and 925 adjustments. The issue is whether appellant's actions violated the statute.
We note that federal statutes have addressed this situation by adding "exceeding authorized access" to the list of proscribed conduct. See 18 U.S.C. § 1030(a) (2002); 18 U.S.C. § 1030(e)(6) (2002) (defining "exceeds authorized access" as "access[ing] a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter"). Our statute makes no provision addressing such conduct. Additionally, subsection 815.06(6), Florida Statutes (2003), indicates that appellant's conduct is outside the scope of section 815.06. That subsection provides: "This section does not apply to any person who accesses his or her employer's computer system, computer network, computer program, or computer data when acting *1231 within the scope of his or her lawful employment." § 815.06(6), Fla. Stat. (2003).
In this case, the evidence was insufficient to prove that appellant accessed the computer, computer system, or computer network without authorization. We reverse and remand appellant's convictions for offense against computer user and direct the trial court to enter a judgment of acquittal as to these counts.
Appellant next argues the trial court erred in entering a restitution order based on testimony that was impermissibly speculative and also erred in using the wrong measure to arrive at the amount of restitution. We agree.
Appellant first contends that the trial court's order must be reversed because the State introduced "mere opinion" estimates and failed to introduce documentary evidence to support the restitution amount. On this issue the State presented the testimony of William Thompson, vice president and general manager for Tropicana Chilled Direct Store Delivery. Thompson was asked how much in retail the company lost due to appellant's actions during the period charged in the information. Thompson placed the amount at "about $280,000." On cross-examination, Thompson reiterated that that amount was the sale price, "the price that retailers would have paid the route salespeople for the product."
Daryl Rashkin testified that each day after the employees left the facility, he and Chaviano compared the order forms against what the videotape showed was actually being loaded into the trucks. Rashkin testified that "[t]he value of the product that was stolen during that period was $280,000.00." That amount was retail value. Rashkin put the cost to the company of producing those goods at "approximately $140,000.00." Rashkin never specifically testified that he used the process of adding up the differences between the amount paid and the amount that should have been paid in arriving at those figures.
The mere speculation or opinion of a victim as to the amount of their loss is insufficient to sustain a restitution order. See Glaubius v. State, 688 So.2d 913, 916 (Fla.1997); Peters v. State, 555 So.2d 450, 451 (Fla. 4th DCA 1990). We addressed a similar case in Bennett v. State, 944 So.2d 524 (Fla. 4th DCA 2006). In Bennett, a private investigator hired by the victim testified that the victim spent "probably . . . between eighteen and twenty-thousand dollars" on the investigation. 944 So.2d at 526. As to the victim's protection expenses, the investigator testified: "I would guess he probably spent a hundred-thousand dollars." Id. The victim himself testified that he was "out-of-pocket over a hundred-thousand dollars because of Mr. Bennett's actions against me." Id. We held such speculative testimony an inappropriate basis for a restitution award. Id. We hold the testimony in the present case regarding Tropicana's losses similarly speculative and therefore an inappropriate basis for a restitution award.
Appellant also claims the wrong measure was used to arrive at the amount of restitution. Appellant's argument rests on the fact that the Tropicana warehouse distributed some of the product to retailers itself using its own trucks, and also sold some of the product to independent distributors at the warehouse. These independent distributors would get a discounted price on the product, and then mark up the product to turn a profit. The scheme to defraud in this case involved the independent distributors.
The record supports appellant's assertion that the restitution order was based on the price the product would have *1232 fetched if Tropicana was selling it directly to retailers rather than to the independent distributors, as was the case here. Thompson explicitly testified that $280,000 was the price Tropicana would have received for the product from a retailer. Fair market value is generally the correct value to be used in determining restitution. See Walters v. State, 888 So.2d 150, 151 (Fla. 5th DCA 2004). However, restitution is not intended to provide a victim with a windfall. Glaubius, 688 So.2d at 916. In State v. Hawthorne, 573 So.2d 330, 333 (Fla.1991), the supreme court foresaw that there would be situations where fair market value would not be the correct measure of restitution. The court held that trial courts are not tied to fair market value, but may exercise discretion to further the purposes of restitution. Id. at 333. It would be contrary to the due process principles cited by the supreme court in Glaubius to hold that appellant must pay a higher restitution amount than what the independent distributors would have paid for the product.
We therefore remand the issue of the restitution order with directions to the trial court to conduct an evidentiary hearing to determine the amount the independent distributors involved would have paid if properly billed.
We hold all other issues raised by appellant and not addressed in this opinion to be without merit and affirm.
Affirmed in part; Reversed in part; and Remanded for further proceedings.
MAY, J., concurs.
GROSS, J., concurs in part and dissents in part with opinion.
GROSS, J., concurring in part and dissenting in part.
I concur in the majority's resolution of the organized scheme to defraud issue.
As to the section 815.06, Florida Statutes (2003) violation, I concur with the reversal because I believe that appellant fell under the section 815.06(6) exclusion  he was an employee who "accesse[d] his . . . employer's computer system when acting within the scope of his . . . lawful employment." Part of appellant's job duties allowed him access to the computer system. My reading of the statute is that it applies to hackers who attack a computer system from the outside.
I dissent as to the reversal of the restitution order. The testimony about the loss came from a competent witness who did not speculate. $280,000 was the fair market value of the property. In most cases the "victim's loss and the fair market value of the property at the time of the offense will be the same." State v. Hawthorne, 573 So.2d 330 (Fla.1991). Under Hawthorne, this is not a case where a court should depart from the market value approach.